Our first case for argument today, well, we're going to consolidate the three of them. I'll read all three numbers, 2017-2257, 2017-2621, and 2018-1063. All of them are trading technologies versus IBG, and for clarity, we're just consolidating them for purposes of oral argument. Mr. Gannon, please proceed. Good morning. May it please the court, I'd like to reserve eight minutes for rebuttal. And I'd like to start with the 374 patent, which is related to the four patents in the IBG case. It's the same patent family. It's the exact same specification as the patents in IBG. The IBG case resolves the question of jurisdiction for the 374 patent in TT's favor. There are no meaningful differences among the claims in the patents in IBG and the 374 patent. In fact, IB has admitted that for purposes of CBM eligibility, the differences between the patents in the IBG case and the 374 patent are immaterial. And there's a good reason why they've admitted that. The technical problem found in the IBG case with the figure 2 style screen is the exact same technical problem in this particular patent. It's a problem with the figure 2 style screen. What is the technical problem? The technical problem is with the figure 2 style screen. It displays information at the inside market on a grid. And the information is coming from the exchange. And the numbers on the grid are unpredictably changing as the market changes. That's all software. Pardon me? That's all software. That's all software, correct. But I don't see any technical problem. What is the technology you're talking about? The technology is the graphical user interface itself. The graphical user interface is the interface between the trader and the computing system. And that graphical user interface, the problem was in the interface itself, the way the interface was constructed and how it operated. The inside market would change, the prices would flip, and the trader would miss his or her price. That's the problem. And it's a technical problem because it's a problem with the graphical user interface. It's a technical problem because somebody said so. I don't see it as a technical problem whatsoever. It's purely software. Your Honor, I appreciate that. I believe this court has said that software, you can solve technical problems and have technical solutions with software. Well, they've said it as sort of a guerrilla warfare against the Alice case. I have yet to see it. Yeah, I don't think Alice extends that far to say that you can't get a patent on software. If that's the case, then you're going to be wiping out an entire area of technology that I don't think Alice intended. Well, they said something about if it improves the computer or something like that. This is not improving the computer. The computer had its capabilities. All you did was trigger it. Well, Your Honor, I respectfully disagree. The graphical user interface is a part of a computer, just like a processor, just like the memory. If you're improving the graphical user interface, you're improving the trading system. That's been found by this court in the ESB case back in 2007 that there was a problem with the screen. And in the CQG case from this court, this court found that the same patents, the same specifications solved a technical problem with a technical solution. It found it was a technological invention, the CQG case. And then it was found again just recently in the IBG case. Where did the IBG case find, as you say, that it was improving the computer's function? Well, IBG, I believe, cited to the CQG case, the CQG opinion. So what you're referring to as the IBG case felt bound by CQG's prior determination. I think IBG did follow CQG and did find that in CQG that the CQG court found this was a technological invention. Well, they said it. They didn't find it. And both of those are non-precedential opinions, aren't they? The CQG, correct, was non-precedential. I don't think that matters one bit. case, which was precedential, cited to the CQG case and acknowledged that in that case there were technical problems and technical solutions solved by the staff. Cited to it and maybe shouldn't have. We are not really supposed to be using non-precedential opinions as precedent. Well, I appreciate that, Your Honor. But again, in multiple cases now, this court has found that there was a problem with the GUI. It's a software problem. The patent solved that problem. And that's a technological improvement. The 374 patent, as I said, the 374 patent, again, is addressing the same problem. And it's doing it through the claims with a specific structure, makeup, and functionality. It's part of the same family. It's part of the same family. In fact, it's the exact same spec as you in the IBG case. I want to ask you a question that's maybe kind of an aside, but I do think it's relevant. Pardon me. The comparison here is that this invention is an improvement over figure two. In figure two, the figures change and can change just the instant you want to place an order. And that could skew the intended result. But why the comparison with figure two? Why not compare it with sort of the way things used to be done on paper? And people would write bid, ask, bid, ask, bid, ask as things changed. And whatever was written down remained the same. It never changed. The reason why you look to the figure two style screen, first of all, the spec is referring to the graphical user interface. The pen and paper issue, the problem didn't arise in pen and paper. There was no problem with that. The problem arose with the graphical user interface, the figure two style screen, the way it was constructed, having the inside marking in the same location on the screen. So that problem didn't exist. It didn't exist on paper. But that was a problem not the result of sort of a shortcoming in computers or computer functionality. It was perhaps a shortcoming in the way whoever it was that came up with figure two came up with figure two. Well, actually, figure two is a representation of a graphical user interface that a trader interacts with. So I believe that it is a problem with the computer. You have a trading system. The trader is interacting with that front end. But it's a problem because of the way the computer was programmed. It's a problem in the way that the graphical user interface was programmed. And it is a software problem. That's exactly right. It's a problem with the software, how that screen was constructed that gave rise to the problem. The invention, though, provides a different interface that improves the functionality of the overall graphical user interface system. And if we are consistent with the decision in CQG, we would have to reach the same result. That's exactly right. The 374 claims, if you look at claim one, for example, is very specific. It's talking about graphical locations along a price axis that are displayed. You have price levels, sequential price levels that are mapped to the location so that when a user, when a trader goes to click in that graphical location, the price level is mapped to that location. So if the inside market changes, the mapping doesn't. And so when you click on that location, the trader will get the intended price. So it's using different words to solve the problem of missing your price. And the claim also solves the speed problem because the single action of the user input device in that graphical location sets the price along the axis and also sends the order. That single action limitation is common to all the patents in IBG as well. So speed and accuracy, this invention, the 374, it's using slightly different wording, which may be relevant for, for example, infringement. But for purposes of eligibility, it's way over the line. Well, the more you talk, the less it sounds like it's technology and more coding. Well, again, I think that goes back to, I think your question, Judge Mayer, I think goes back to Alice. I think Alice was very clear that was a way of doing intermediated settlement on conventional computers. And I think the Supreme Court said if you do that, you're not patent eligible. I don't think the Supreme Court meant to say if you're doing a software improvement on a graphical user interface for a computer, that that's not patent eligible. That can't be the result. Or does that mean every time we get a bug, a fix on a bug on our iPhone, that we got a new invention? I think it depends on what the claim, what the claims are directed to. For example, if you had an interface that had text to click on to get to information in the prior art, but then you came up with a new way to display an icon, for example, that made it easier for the user to recognize something and to access things on the user interface, I think that would be an improvement in software. It would be an improvement in the graphical user interface. And again, we're talking about... Well, it may be, but it doesn't sound like it's technology. The technology is there. The technology isn't there because... Sitting there waiting to be tickled. Well, in the example that I'm giving, the technology wasn't there because you had a way for users to interact with the computer that had a problem. And then in my example, the improved graphical user interface makes it so that you can access the computer easier. It really comes down to can you get... Are we going to say that the software inventions are not patent eligible? And I just think that's not... Well, I would hope so someday. I understand that, Your Honor. Again, I don't believe that the Alice case went that far. I do not believe they intended that to be the result. Except for that one sentence about improving the throwaway line there. That's basically what they were... Almost what they said. Well, I think they were clear on what they said in terms of a fundamental economic practice and just slapping it on a conventional computer. They said that's not patent eligible, but if you're actually improving the graphical user interface, if you're improving a database, if you're improving the processor, then you're patent eligible. Now, 103... I don't see where anyone said if you're improving a graphical user interface, you're eligible. There are lots of ways you can improve an interface, most of which could be cosmetic and superficial. I don't see how that necessarily entitles you to eligibility unless somehow it's actually improving the computer function itself. Well, so if you look at Data Engine... And that's what the CQG case held. It expressly held that the static price index, and namely the problem of the trader placing the trade at the wrong price, was a technological problem that was solved by the patent. And that's why IVG came out the way it did, as you well know. But you spent all your time on this 347 patent, no doubt, because it's the best for you. It's the same family. Why don't you turn to the other two? Because I don't see how those are technological inventions, because they don't solve that very problem, which was the problem CQG identified. They don't use anywhere in the spec the static price index language. But moreover, and importantly, those patents are not directed to improving or eliminating a problem with making the wrong trade the way that the 347 arguably is. So please turn to those and defend those, because I'd like to hear you do that. I appreciate that, Your Honor. I was just getting to that. So the 999 and the 056 are the same specification. Of each other, but not as any of the patents previously cited by this court. Correct. They're not part of the same family that was addressed in CQG. Correct. It's a different patent family, different spec, different claims. As Judge Moore pointed out, the claims don't have static, and they don't have single action, and they're not solving the same problems with the same solutions. And I'll start with the 999. The 999 patent is solving problems with the prior art graphical user interface in a different way. You say it solves it in a different way. It doesn't address the kind of problem that was addressed in the 374 patent. It simply displays real-time information as trends progress. But other than that, that just seems to me to be the gathering and displaying of information, what computers have always done. And that was the same argument made by IB with the 374 and other patents in IBG. But if you look at the claims of the 999, and I'll start with the 999, they are very specific claims that solve problems with prior art GUIs. Problem number one, the prior art, as the spec says, in three different places was not intuitive because you didn't see the market. You just saw the best bid and the best ask. What does that have to do with the computer's functioning? It has to do with the graphical user interface. No, it has to do with the person who is executing trades. Intuitive. Computers and intuitive. You're telling me that an interface, being intuitive or not, is related to improving the computer or related to improving the person's interaction with the computer? It's improving the computer functionality, just as was found in Data Engine. Data Engine is a perfect example. In that case, it was an electronic spreadsheet, and they added tabs to the spreadsheet. It made it more user-friendly. It made it more intuitive for a user to be able to access the spreadsheets. No, but that was a different way to interact with the computer, and it was a different way for the computer to function. That strikes me as being dramatically different from what we're dealing with here because all you're doing is giving the user different information. It seems to me it has nothing to do with improving the actual functionality of the system. It's improving the graphical user interface, just like the Brumfield patents, and here's how it does it. Well, it's different. It's a different problem and different solution. I'll give you that, but how it's doing it is it's saying there's a problem. These prior screens only show you the inside market. It's not intuitive. It's not user-friendly because you don't see all the bids and asks along a scaled price axis, a scaled price axis which shows prices where there are no orders, and you see all the bids and asks. But that's not the only thing the 999 claim has. It also has the functionality of showing the user's order, an order icon on the screen, and that solved the problem with prior graphical user interfaces where prior to that, your order wasn't shown on the screen. It was in a different screen. It seems to me you're saying that every new and different graphical user interface is patent eligible. We're not saying every graphical user interface is patent eligible. What we are saying is that if you have a graphical user interface that's improving, that is an improvement. That's an improvement. Improvement to what, though? That's the problem. Improvement to the graphical user interface. That's not a computer. It's an interface. It's just an interface. That's just a presentation. It's like the wrapping paper on a Christmas present. It's not the present. Well, you know, I flew out here from O'Hare, and I respectfully disagree. Those graphical user interfaces in that cockpit are critical. How the pilot interacts with that graphical user interface, it is technology. Problems with the graphical user interface can cause severe issues, flying, for example, on airplanes. This is no different. It's a graphical user interface. Now, instead of flying an airplane. Improving a graphical user interface, in my mind, would be enhancing the resolution, for example. That would go to the functioning of the graphical user interface. But just categorizing and differently presenting the data, you know, like, for example, hey, let's put it in bold instead of regular text because people can see it better. Or let's put the really important parts in bold. Ah, now I have a graphical user interface which has improved technology because people will make fewer mistakes because the important things are bolded. That, it seems to me, under your arguments, would be eligible, and I just don't see how that's possible with the state of the law. Well, so what we're saying with respect to the 999, I only got through the two of the problems. One was the lack of intuitiveness. I would have thought you would have started with your strongest ones. Go ahead. The intuitiveness. Second, you have this order icon for the first time now is being displayed with all of the other orders. And now, if you want to change your order, what the 999 patent, the claim is directed to, instead of going to a different screen and finding my order and canceling it and sending a new order, the 999 patent allows you to select your order on the screen, move it to a new location along the scaled price axis, put it there, which automatically sets a price. And then you send the order from there. It's solving. What it's doing is it's making it more efficient for the trader to be able to trade more quickly, more efficiently. It's no different than any other improvement to a graphical user interface. It's a very specific claim that's solving three different problems. Actually, three different problems. Intuitiveness, having your order on the screen, being able to click on your order, move it to a new spot along the scale price axis, select a price, and send the order to the exchange. That's improving over prior graphical user interfaces that didn't have that functionality. That's the 999 patent. Real quickly, I just want to hit the 056 patent. Again, it's the continuation patent off of the 999 patent. That patent also solves problems with prior art GUIs. The first problem is the same. It's the not showing all of the orders on the screen. You only see the best bid and the best ask in the prior art. The 056 claims solve that problem by providing a price axis with the market, including the inside market. And then it claims a specific way to select a default quantity for the trade. And the default quantity allows you to make multiple trades at the same quantity without having to select the quantity every time between each trade. So you select the default quantity. You select the default quantity along the price axis, which sets the price for a quantity. Again, it's solving a problem with the prior art graphical user interfaces. Is it as revolutionary as the Brumfield patents? No. But that's not the test. The test for eligibility shouldn't be how great is the technological invention. The test is just is it a technological invention? Issues of 102 and 103 then would deal with issues of, well, was it obvious to do that? And if there are no further questions, I'd like to save the rest of my time for rebuttal. Great. Okay. Let's hear from on the opposing side. Mr. Picard. May it please the court. I'd like to start with the CBM eligibility issue as it relates to the 374 patent. And I think it's important to not lose sight of the fact that the claims of the 374 patent are radically different than the claims that were addressed in the CQG decision and last month's decisions in the IBG cases. When you say radically different, in what sense? I'd like to step you through it. And the board essentially stated that fact in the final written decision at pages 14 through 15, which we pointed out in the red brief at 12. If we go to claim one of the 374 patent, we have a receiving step. The computing device receives market data. That's just information about bids and offers for a given commodity. It identifies the prices for those bids. And then it has a single displaying step. And the displaying step is the display of an axis. And the axis has graphical locations that allow for the user to click on them. And in the final step, that would result in the sending of a price. There is this mapping step in the claims. And that's where the prices of the bids and offers are mapped to this axis. However, those prices are not displayed. The board found that in paragraph, I'm sorry, final decision 14. And the fact that the mapping is not displaying is confirmed by looking at the dependent claims in this patent. For example, if we look at claim 32, which depends from claim one, it says displaying by the computing device the plurality of sequential price levels in alignment with the plurality of graphical locations. Claim one doesn't display those prices. You can essentially have an unmarked line. And when you click across the regions there, it would send a trade. Again, confirming that displaying and mapping are different. If we look at claim 22, it recites both displaying and mapping. In addition, the 374 patent does not recite the static axis. If you look at the mapping step, all it says is at the moment that you map new prices to the axis, you keep it static at that very moment. But the axis can change at the moment before and the moment after the price has changed. And you think about the speed of a clock cycle on a computer, the problem that this figure 2 would allegedly present would still be there because the human being can't relate to that kind of time scale. So the axis can move any time in the embodiments except that one instant when price levels change. But before and after, it may move. So we think about that.  And the well-known technique of clicking along that line to send an order. And for that reason, the PTAB was not arbitrary or capricious when it found that the problem solved by the 374 patent was not a technical one and it didn't do so with a technical solution. Unless there are questions about the eligibility question on 374, I do want to talk about eligibility as it relates to the other patents involved in this hearing, starting with the 999 patent. We heard from Mr. Gannon today, and I think it largely tracks what was in the letter brief that the party submitted last week. And they essentially point out three supposed technical problems that were solved by the 999 GUI, the first being that conventional GUIs did not display all pending orders. This is at page three of the letter brief. Well, respectfully, the 999 patent doesn't do that either. It merely displays a plurality of bids and offers, not all. More importantly, if we think about that problem, if we look at the background of the 999 patent and the 056 patent, it talks about the way of trading before these supposed inventions. And in that environment, the market would track every single bid and offer that was pending. And it would provide that information to the market makers who could trade on that information. So the problem wasn't a technical one. The problem was one of, at least in this single respect, was about information access. Who do we give the information to? According to the 999 patent, in the prior art, the decision was made to give it to the market makers but not run-of-the-mill traders. That's not a technical problem. And we can see that, for example, if we look at figure two from the 132 patent to the joint appendix of 8610, that solved the same problem that they're pointing to here. It presents a plurality of bids and offers in that GUI. That was not a preexisting problem. As I understand Mr. Gannon's argument, he's basically saying that there's improved functionality here because the graphical user interface of the 999 patent, the claimed invention in the 999 patent, is based on a reconfiguration that provides enhanced information to the user. I think, as I understand their argument, it's a more intuitive way to present the information than conventional GUIs. We don't really know what the conventional GUIs are except for the single example of figure two. Let's say it's a more intuitive way to do it, but it's different, and it's different because it was programmed differently. The fact that it is different is not dispositive about whether it is a technological invention. How did it become different other than being reprogrammed, which is essentially technology? The programming techniques to display bids and offers along an axis is not a technical solution. The board was correct in finding that because the programming techniques that were used, the choices about how to display information, those didn't involve new or non-obvious programming techniques or new hardware. In fact, you read the patent, it doesn't explain how to do any of this. It's all result-oriented computer functions that are generic. Those are not technological inventions. Yeah, but they just didn't happen overnight. They happened because somebody created a different program. Yes, it did, but the effort, and even if it's more intuitive, doesn't make it technological. I think it's important to be mindful of our standard of review here as one of arbitrary and capriciousness. It was not arbitrary and capricious for the board here to look at the patent, and the patent identifies the problem of traders not having access to sufficient information. It talks about the market exchanges would not share all the bids and offers to all of the traders, but they did to some, and there was a problem that the traders had to gather information from numerous sources so that they could anticipate where the market was headed and improve profitability. The board did not act arbitrary and capriciously, saying that's not a technical problem. It's the problem of synthesizing information and human comprehension. If I may, I want to turn to the second point that Trading Technologies has raised in their papers about the supposed technical problem solved by the 999 GUI, and they say that the GUI displayed own orders in a separate window. Again, not a technical problem. It's just a design choice about where to display information on the screen, and again, this relates to the notion of the drag-and-drop functionality that is claimed in the 999 patent. That wasn't new or not obvious. That was famously well-known by the time of the 999 patent. Again, the board was well within its bounds to so find. Finally, they claim that the conventional GUIs that existed at the time of the 999 patent had slow and efficient order entries requiring multiple steps. The 999 patent doesn't have sort of single action order entry, if you will. If you look at the claims and compare them to the description at column 10, line 44, to column 11, line 4, you'll see that whether you're dragging and dropping the token or using the task bar, you have a multi-step process that requires selecting quantities and then dragging it to the right location or filling in a box, and then when it's all said and done, there's a confirmation window, which then requires the user to confirm, modify, or cancel the orders. So the efficiencies that may have been present and we submit they're not in the 374 patent, they're not present in 999 or 056. Not to mention, if we look at the prior art GUI of Figure 2, it already solved that problem with single action order entry. That's the problem that they've said that when you click on Figure 2, it sends the order. You don't have a chance to modify it. This wasn't really a problem. These are all made-up problems. I may then turn to their points raised on CBM eligibility as concerns the 056 patent. They raise two points here. Again, this notion that the conventional GUIs did not provide an intuitive view because they did not display all bids. Again, as with the 999 patent, the 056 does not display all bids and offers either. It's just a plurality. And as with the 999 patent, that's not a technical problem. That's a problem of who do we allow access or who do we distribute information to. They also make the point that the prior art GUIs didn't display information on a scaled price axis. If you look at the 056 patent, they don't recite the scaled price axis, so that's not a feature of those claims either. And again, they raise the similar point in 056 as they had with the 999 patent, that somehow the 056 solved the problem of slow and inefficient order entry. If you look at the claims of the 056, again, they don't provide a solution to that. And even if they did, it wouldn't be a technical one. There's no single-action order entry. Even if there was, that's a well-known technique of using mouse clicks  If there's no questions on CBM eligibility, I would like to briefly touch on the 101 issues. This relates to the 056 patent and the 999 patent. If we look at the ARMS treatise, for example, or reference, as well as the Weiss reference, which is in the records of those two cases, what we see here in both of those examples is a display of offers and bids on a price axis. And it would be updated. All that's happened here is the automation of that display using generic result-oriented computer commands. And those are not the kind of inventions that are eligible for patenting. If we then turn back to the 374, the claims, again, are strikingly different than what's in 132 and 304 patent. Because you don't display prices along the axis, you can't possibly solve the problem that figure 2 allegedly presents. And so the basis for their patent eligibility in those related cases simply doesn't exist here. Moreover, there's no static price axis in the claims of the 374 patent. If you look at the claims there, you'll look at claim 7. I think that's the closest one that gets to a static price axis. Now, you are trying to distinguish it from the earlier cases, but that really isn't necessary since it's a non-precedential. Don't you agree? I do. I mean, even if they were right, which I doubt. We respectfully think that those decisions were not correct. The record that was presented there is different than the record in this case, and that may be one reason. I just want to point out that there are no static price axis in the 374 patent. I was pointing to claim 7, which talks about keeping the mapping static, but again, there's no display of prices in that embodiment. They don't separately argue for the patent eligibility of claim 7. They instead focus on claims 13 through 15. Those claims depend from claim 1, in which there is no static price axis. So again, that doesn't solve and can't solve the problem that they have presented as it relates to Figure 2 style GUIs, and the PTAP should be affirmed in its patent eligibility findings as to that patent as well. Unless there are other questions touching on the obviousness issues, I will yield my time to the government if that's possible. Thank you, Your Honor, and may it please the Court. We've intervened to address the constitutional issues here. As we explained in our briefs, the issues were forfeited, and this case does not involve a retroactive application of the CBM procedures at all, but I'd like to focus on the due process and the takings arguments. First, with respect to due process, just as in PATLEX, Congress had a rational basis for applying CBM review to patents that issued before the AIA was passed, and that was to correct agency mistakes and to protect the public interest by keeping patents within their legitimate scope. With respect to the takings issue, the cancellation of a patent through covered business method review does not constitute a taking because it rests on a determination that the patent holder never had a valid property interest in the first place. And also, cancellation occurs only after this... Are these pre-CBM patents? Excuse me, Your Honor? Are these patents, do these patents precede the enactment of the CBM statute? I believe that these patents were all issued prior to the AIA. So these patents were issued at a time when Section 101 was not allowed to be challenged under any sort of administrative review? That's correct, Your Honor. So why wouldn't it be a taking to now introduce into the existing patents, which were awarded property rights, they were awarded at a time when 101 couldn't be challenged in any administrative proceeding, why wouldn't it be a taking to allow that to occur now? Well, Your Honor, for a few reasons. First of all, just to look at PATLEX. Of course, when ex parte re-examination was created, there was no prior form of agency reconsideration at all. And the patent holder in PATLEX argued that the fact that the presumption of validity didn't apply in ex parte re-examination meant that there had been a taking. And this court rejected that argument and held that the presumption of validity was merely a procedure and that the patent holder didn't have a property interest in the procedure by which the validity would be determined. There's a difference between the procedure and the substance, though, isn't there? Well, exactly, Your Honor. And the substance, I think this is really the key point. The substantive criteria of patentability, including Section 101, are the very same criteria that existed when these patents were issued. So a patent that was not patent eligible before the AA is also not patent eligible after the AA and vice versa. So the substantive criteria are the same. The only thing that's changed is... I think the entire patent world would disagree with you. I think the substantive criteria was changed significantly by Alice and other cases coming from the Supreme Court. I don't think the patent community at large would rally behind you and say that the current state of 101 law was the current state of 101 law two decades ago. Respectfully, Your Honor, of course, you know, there have been additional decisions by this court and by the Supreme Court. Oh, no, we've seen a major sea change over the last few years. So I am hard-pressed to imagine that at the time these patents issued, their eligibility could have ever been legitimately challenged at that time based on the state of precedent. Your Honor, just as, you know, whenever a court interprets a statute, a court's not changing the law. The court is saying what the law has always been. No, this is a judicially created exception. This is a change to the law. This is a change to the law. A judicially created exception is not the law. There is no interpretation of the statute, and the Supreme Court doesn't purport that there is one in Section 101. The words abstract idea don't appear in Section 101. That's a judicially carved out exception. The statute would dictate all of these things are, in fact, eligible because they are processes or methods of operation. They fall clearly within the language of the statute. So how is a judicially created exception, newly created exception that did not exist, absolutely does not exist in the statute, how is that not a taking? Well, Your Honor, just as this court applies Bilski to patents that were issued prior to the decision in Bilski, and there's no taking there, the same is true when the board applies the current understanding of what Section 101 means to patents that issued prior to those decisions. The court isn't changing the law. It's interpreting what the law has always been. And so respectfully, I think that what the board is doing in a CBM proceeding to pull the audience to see how many people think the law has always been this way in 101. Always been, you know, pre-Alice and post-Alice, the law is the same. But, Your Honor, I mean, it is true that this court applies the current interpretation by the Supreme Court to all patents, regardless of when they're issued. And there isn't a taking involved when this court applies a new... I'm just wondering if there is when an entirely new regime is created, CBM, which adds to the agency's authority, the ability to revoke a patent on a ground it never previously had the authority to revoke the patent on. And that is not a taking for a couple of reasons. First of all, our primary argument is that before the agency would cancel a patent, the agency has determined that the patent was never validly issued. And then the patent isn't canceled until this court would affirm that determination. So it's just the same as when a district court determines that a patent is invalid, and there's no taking there. So then is it your view, because you've hinged a lot on the fact that 101 existed, though really wasn't applied the same way when these patents were issued, and 101 was a criteria they needed to overcome and they didn't. What if Congress added Section 109 to the Patent Code? I don't think there is one, but there might be. What if they added a new section to the Patent Code with a new way to invalidate patents? And then what if they gave the PTO the authority in the CBM proceedings to use that new way to invalidate patents? Everyone agreed that new way did not exist when the patents issued. But Congress makes a change to what kinds of stuff it thinks ought to be patentable. Would it be a taking under those circumstances? Because you hinged a lot of your argument on the fact that 101 was a criteria at the time these patents issued, so it should be fair for the agency to apply it in a reconsideration setting. So what if it weren't a criteria? Then would there be a taking? Well, that would be an entirely different case than here, because it would be a change. You know what? I'm allowed to ask hypotheticals. That's kind of what we do as judges, to test the extent of your arguments. So why don't you just assume that's what I'm doing? Sure, Your Honor. You can rule in our favor without finding that that would not be a taking. No, but answer my question about whether you think it would be a taking. Your argument has been presented to us as distinguishing this case from the type of case where it wasn't the same. I think that would present a much harder question than this case. I'd like to know what the government's thoughts are on that harder question. Your Honor, I mean, I don't know what to say other than it would be a much harder case than this case, because here we don't have a substantive change in the law. It's the same criteria. It's the same 101 criteria. It's the same requirements of novelty and non-obviousness that have existed. And another way to think about it, Your Honor, though, is that what's— No, but you see the analogy in my mind that if it's not the same criteria, if there was a major change in the law which was not statutorily based, but if a new judicial exception was created to a statute, say that the previous judicial exceptions didn't include abstract ideas. Say the previous judicial exceptions didn't say all software is ineligible. And say I understood Alice as saying all software is ineligible. It is a brand-new, undisputedly new judicial exception to patentability. I'm not sure we're in a different place. But, Your Honor, respectfully— I'm not sure this isn't that harder a case. Respectfully, the court—in that situation, the court would apply that new judicial interpretation to all patents, regardless. If you take CBM proceedings out of it, just another case that's being appealed from a district court. A district court or this court would apply the current interpretation of what Section 101 means. Wouldn't it potentially be a taking there, too? When Congress creates a means for eliminating a property right that someone has been given and believes they're entitled to, doesn't that create a taking? I think there's a difference between if Congress created— if Congress changed the law and acted a new statute. That's different than when courts are interpreting the law. Courts are saying what the law— No, when courts create judicial exceptions to the law. Respectfully, Your Honor, and the current— Daniel, I agree with you. I don't understand under what authority courts can create judicial exceptions. But respectfully, courts apply the current understanding of the law to the patents, regardless of when they issued. And the way that courts work is that that is a statement about what the law has always been. And it's not treated as a change in the law. And I think the same thing would be true here. Another way this court could look at it— Let me shift gears for a bit, because I think your time is running short. No, it's not, because he reset it. He gave him all the time that guy had and then all the time that she had. So he's got, like, all day. Okay. Good. I do have one more point I want to make. In your brief, you said trading technologies forfeited its constitutional challenges by failing to raise them before the board. Yes, Your Honor. Does the board, as an administrative agency, have jurisdiction to pass on constitutionality of federal statutes? It does, Your Honor. But I'm glad to have the opportunity to address this issue. So in our view, if trading technologies had raised this argument before the board, the board could have declined to institute CBM review, or if it was after institution, the board could have reconsidered and terminated the proceedings. So it wouldn't have been futile, because the agency had statutory authority to do something about the argument. There are cases in which courts have said that agencies generally do not have authority to address the constitutionality of statutes. But the Supreme Court has made clear in Thunder Basin and in Elgin— And I have the citations for you. That's 510 U.S. 200. That's Thunder Basin and Elgin 567 U.S. 1. The Supreme Court made clear in both of those cases that the general rule that agencies don't have authority to address the constitutionality of statutes is, quote, not mandatory. And in Thunder Basin, the court approvingly cited the fact that the agency, in that case, had addressed constitutional issues before. In addition, this court, in Riggin v. Office of Senate Fair Employment Practice, which is 61 F. 3rd. 1563, this court held that the agency at issue there could consider a facial equal protection challenge to a statute in the course of an agency-administrated proceeding. So I do not—there is no categorical bar against agencies considering constitutional challenges to statutes. In addition, in In re D.B.C., of course, this court held that a constitutional argument was forfeited because the party hadn't raised it before the Board of Patent Appeals and Interferences. We think that the same rule applies here. And I just want to make clear that we do think this isn't a case where it would have been futile for them to raise it because they could have declined to institute the proceeding and that would have, you know, obviated the constitutional injury that they're claiming of. But in addition, one last point— Do you think their argument is sufficiently raised in the Blue Brief? I mean, I've never seen a constitutional argument been given three sentences in that we should not apply the doctrine of constitutional avoidance but rather take it head on at that point. What are your thoughts about whether it was waived in the Blue Brief? Your Honor, I think that they put the absolute bare minimum that they could. Bare minimum would suggest it's enough. Bare minimum would, you know, I don't know. They hardly raised the issue. I agree, Your Honor. You know, the government would be happy if this court found that they had not raised it sufficiently. We haven't made that argument in our briefs. We've made the argument that their failure to raise it before the agency constituted a forfeiture. But if this court finds that their failure to flesh it out in their briefs is also a forfeiture, we would certainly agree with that. I just wanted to make one last point on the forfeiture argument that we did make, which is that the Supreme Court in Elgin also recognized that even when it would be futile for a party to raise a constitutional argument before an agency, even when it would be futile, there are still benefits to requiring litigants to raise arguments before an agency. And that's because an agency can apply its expertise to threshold questions, to the statute of issue, and to related issues that can then aid a court in addressing the constitutional issue on appeal. And, of course, here, if the board had had the opportunity to address the constitutional issue and had determined that there was no constitutional issue, this court would have had the opportunity to review that full decision on appeal. Okay. Thank you very much. Mr. Gannon has rebuttal time. With respect to the 374, I just want to respond to a couple points that I.B. made in their letter brief. I.B. primarily relied on the lack of static price access in the claims of the 374. What difference does that make? It's unprecedented. It's something that I.B. relied on, and I'm just pointing out that the 411 patent in the I.B.G. case also didn't have static. It didn't matter because the claims had specificity. They were still solving problems, the same types of problems, and it's really a form over substance type argument. I.B. is essentially asking for reconsideration here from what they already lost by them saying, oh, static's not in this claim. Well, and I think I.B. is actually moving for reconsideration on that point. We'll see how that goes. But arguing it here is just asking for reconsideration. One thing I.B.'s letter brief doesn't address is the claims. They don't address the claims, the specificity in the claims of the order entry region along an axis where you have a plurality of sequential price levels mapped to those graphical locations or single action order entry to set the price and send the order when you click on the graphical location. Their letter brief's silent on all the details of the claim, and I think that's telling. The board errors here, number one, the board said there's no problem disclosed in the PAP. There's no issue with figure two. That's been rejected repeatedly by this court. The board also erred by finding that there was no technological solution. The board basically said, well, this claim just requires the use of known technology. You can use mice or you can use a laptop or any kind of computer. The board completely missed the solution, which is the specific structure, makeup, and functionality of the GUI that solves the problem in the specification. With respect to 101, and of course we don't even get to 101 on the 374, but I just wanted to point out that I.B. admitted that the 374 is no different than the patents in IBG for purposes of 101. And I have a site for that if you'd like. It's trading technologies. That's not relevant. You can't stipulate to law. It's a legal question. They can't stipulate to law. You don't win because they stipulated to law, even if they did, which I know he would say he didn't. Well, they said for purposes of 101. They told the district court. And what is 101? A question of what? A question of law. Right. And that there's no difference between the patents. With respect to the 999 and the 056, the freezing patents, I want to respond to the letter brief, again, IB's letter brief. They basically say, well, IBG doesn't apply because these patents don't have static and single action. Again, that's irrelevant. IB is arguing that we're saying that all GUIs are technological. That's not TT's position. What IB cites, too, in their letter brief is the Amerith case. And that I want to focus on because that case found that the patent was a covered business method. And why is that? It was conventional computer components applied to a well-known business practice. It was these menus for ordering and putting those menus on an off-the-shelf computer. And this court said, in that case, that is a covered business method. There's no technology. And the reason why it wasn't found to be technological is there was nothing in the claim saying how to improve the display. There was nothing in the claim saying how do you improve it. Our claims in the 999 and the 056 are nothing like that. These claims have a specific way. They claim a specific way how to improve the graphical user interface. Our claims are not just trading electronically using a GUI or taking an off-the-shelf computer and then trading. If that was our claim, it would be a different issue on CBM. Our claims are very specific. The 999 patent, starting with that, it's displaying the bids and ask along a scaled price axis, selecting an order icon, moving it along the axis to set a price at a new location. That speeds up order entry. And I want to just be very clear on this point. The patent says in the spec at column 1, lines 59 to 63, a system is needed in which trend information of market demand for an individual item is provided to traders in an intuitive format, an intuitive format, which allows traders to quickly interpret how market demand is changing to an item. At column 2, lines 39 to 41, the spec says the user interface of the present invention presents this information in an intuitive format, allowing the trader to make informed decisions quickly. And that's exactly what these claims are directed to. It's a specific arrangement of elements with specific functionality. In the 999, it's grabbing orders and moving them to a new spot, selecting a price. In the 056, it is displaying the market and using a default quantity and selecting a price, again, by selecting along a price axis, again, speeding up order entry. These intuitive displays and speeding up order entry is exactly what was found in Data Engine. As I mentioned earlier, Data Engine, the tab, the notebook tab on these electronic spreadsheets was found to be a highly intuitive, user-friendly interface. Core Wireless is another GUI case. That court found that the invention... It's displaying on page 14 and spanning 15 of the agency's decision on this. Why doesn't that make this patent different than... I mean, just because it shares the same spec, claims can be directed to different inventions, and some inventions can be eligible and some not. In fact, I've written at least one opinion where some claims in the patent were eligible and some claims in the patent weren't. So the fact that it has the same spec doesn't get you over the hurdle. If these particular claims don't really have the same technological advances as those others, are they really a technological invention? The PTO said no and cited differences. Yeah, I think that's where the PTO erred. The PTO didn't understand or appreciate that the claims required sequential price levels that are mapped to the graphical locations along an axis. Well, they say they lay out their claim instructions, which they say were in their institution decision, and then they say the patent owner does not dispute our understanding of the claims, which was explicitly set forth in our institution decision. I believe on the mapping element that's correct. The mapping element is you have sequential price levels mapped to locations along an axis. But what they're saying is Claim 1 does not require the graphical locations to display the price levels that are mapped to them, any other information or even any indication to which of those graphical locations corresponds to bids and which corresponds to ads. Well, I don't agree with that. The patent is very clear that you have to display graphical locations. And then they say the graphical locations could simply be black boxes with price values associated with them and no information provided to the user indicating the price value, the order quantity, or any order type. The patent owner does not dispute our understanding of the claims, which was set forth explicitly in the institution decision. So now you're saying you do, in fact, dispute it, or you're saying you did, in fact, dispute it? We're disputing the fact that the board missed that this invention is solving the problem. No, that doesn't answer my question. The board expressly held that this particular set of claims was different from the ones in CQG and the ones, therefore, that were also before us in IBG in an important and meaningful way, and they're saying, and you did not dispute that understanding of the claims. Our understanding of the claim is exactly what I'm trying to say. But your understanding of the claim today is not relevant. What's relevant to me is did the board err in concluding that you didn't dispute the claim? Because if you didn't make an argument to the PTO, you've waived it for purposes of appeal. The board said here you didn't dispute their understanding, which was set forth in the institution decision. That understanding would make a difference to the outcome of this case. There is no dispute in this case about the meaning. There was no claim construction issue on the mapping or what gets displayed. Well, like what the board said about the claims, then, how can you continue to claim this is the exact same case, focusing on the claim language and their set out in the institution decision understanding of the differences between the mapping and the displaying and those requirements? There is a difference in the claim. What we're saying is the difference doesn't matter for purposes of CBM. And the reason why is- Why? It changes the nature of those claims. It changes maybe the scope for maybe infringement, very similar to the 411 patent. But it goes right to the heart of what the CQG opinion said was the invention in the case. The CQG opinion- What was the computer improved function? The improved computer function in CQG was when you selected a location on a screen, the price wouldn't flip out from under you. And when you map sequential price levels to a graphical location, such that the mapping doesn't change when the market changes, you're solving that problem. You're just doing it in different words, just a different claim. Oh, so you're doing it in different words, but the PTO expressly said those different words mattered and resulted in something different. And you didn't dispute it, is what they said. We didn't have an issue. There wasn't an issue with claim construction. No, because you didn't see how it was going to play out. You didn't realize you'd be in this situation. So you didn't dispute it back then because you didn't realize it was going to be a problem. But now it might be a problem for you. It's not a problem. It's not a problem because, again, the claim requires sequential price levels mapped to the order entry regions along the screen, along an axis. And so when the user goes to click on that area, the mapping doesn't change when the market changes. So it's true, we didn't have an issue on claim construction per se with the board, but we disagree with their result. So you're saying there's a difference without a difference. For purposes of solving the problem, exactly. Okay. I think both counsel, or all three counsel cases taken under submission.